**Exhibit
F**

1   COOLEY GODWARD LLP
    JOSEPH P. RUSSONIELLO (44332) jrussoniello@cooley.com
2   JOHANNA CALABRIA (226222) jcalabria@cooley.com
    101 California Street, 5th Floor
3   San Francisco, CA 94111-5800
    Telephone:   (415) 693-2000
4   Facsimile:   (415) 693-2222

5   Attorneys for Defendant
    JOHN A. HICKEY
6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

12  UNITED STATES of AMERICA,            Case No.  CR 97-0218 WHA

13                  Plaintiff,           **DEFENDANT JOHN A. HICKEY'S NOTICE
                                         OF MOTION AND MOTION FOR
14        v.                             JUDGMENT OF ACQUITTAL AND, IN THE
                                         ALTERNATIVE, MOTION FOR NEW TRIAL**
15  JOHN A. HICKEY,
                                         Date:    February 28, 2006
16                  Defendant.           Time:    2:30 p.m.
                                         Dept.:   9, 19th Floor
17                                       Judge:   Hon. William H. Alsup

18

19

20         PLEASE TAKE NOTICE that on February 28, 2006, at 2:30 p.m. or as soon thereafter as the

21  matter may be heard, in Courtroom Nine of the above-entitled Court, located at 450 Golden Gate

22  Avenue, San Francisco, California, counsel for defendant John A. Hickey defendant will and

23  hereby does move the Court for Judgment of Acquittal and, in the Alternative, Motion for New

24  Trial in the above captioned action upon the grounds stated in the accompanying memorandum of

25  points and authorities.

26         In support of its motion, counsel relies upon this Notice of Motion and Motion for

27  Judgment of Acquittal and, in the Alternative, Motion for New Trial, on the Memorandum of

28  Points and Authorities in Support of Motion for Judgment of Acquittal and, in the Alternative,

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978683 v1/SF                    1.                    DEF.'S NTC. OF MOTION AND MOTION FOR
                                                      JUDGMENT OF ACQUITTAL ET AL.
                                                      CR 97-0218 WHA

1  Motion for New Trial, on the arguments of counsel, and and on all the pleadings and papers on

2  file herein.

3  Dated: January 9, 2006                    COOLEY GODWARD LLP

4

5                                            Joseph P. Russoniello/jc

6                                            Joseph P. Russoniello

7                                            Attorneys for Defendant
                                             JOHN A. HICKEY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

978683 v1/SF                    2.                DEF.'S NTC. OF MOTION AND MOTION FOR
                                                  JUDGMENT OF ACQUITTAL *ET AL.*
                                                  CR 97-0218 WHA

1    COOLEY GODWARD LLP
     JOSEPH P. RUSSONIELLO (44332) jrussoniello@cooley.com
2    JOHANNA CALABRIA (226222) jcalabria@cooley.com
     101 California Street, 5th Floor
3    San Francisco, CA  94111-5800
     Telephone:    (415) 693-2000
4    Facsimile:    (415) 693-2222

5    Attorneys for Defendant
     JOHN A. HICKEY
6

7

8                UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12   UNITED STATES of AMERICA,           Case No.  CR 97-0218 WHA

13             Plaintiff,                **DEFENDANT JOHN A. HICKEY'S
                                         MEMORANDUM OF POINTS AND
14        v.                             AUTHORITIES IN SUPPORT OF MOTION
                                         FOR JUDGMENT OF ACQUITTAL AND, IN
15   JOHN A. HICKEY,                     THE ALTERNATIVE, MOTION FOR NEW
                                         TRIAL**
16             Defendant.
                                         Date:     February 28, 2006
17                                       Time:     2:30 p.m.
                                         Dept.:    9, 19th Floor
18                                       Judge:    Hon. William H. Alsup

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND .............................................................................................. 1

III.  ARGUMENT ................................................................................................... 3

      A.    The Court Should Set Aside The Verdict And Enter A Judgment Of
            Acquittal ............................................................................................... 3

            1.    Mr. Hickey's Conviction on Count Twelve is Barred by the Statute
                  of Limitations Because the Government Failed to Prove Conduct
                  Pertaining to Fund I Which Violated The Statute After July 16,
                  1992 ............................................................................................. 4

            2.    The Evidence Admitted at Trial Does Not Prove That Mr. Hickey
                  At Any Time Devised A Scheme To Defraud Investors ...................... 8

                  a.    There is Insufficient Evidence to Establish the Scheme to
                        Defraud as Charged in the Indictment ................................... 8

                        (1)    Government Contention #1: Mr. Hickey's personal
                               financial statements underlying the guarantee were
                               false because they (1) failed to disclose the Wells
                               Fargo liability, (2) falsely included the value of the
                               Vacaville property, and (3) conflicted with his sworn
                               declaration reflecting a negative net worth ......................... 9

                        (2)    Government Contention #2:  The loans underlying
                               Fund I and Fund II were not secured as represented ........ 13

                        (3)    Government Contention #3:  The use of the funds
                               was misrepresented because Mr. Hickey used the
                               funds for general and administrative expenses,
                               selling commissions, and management fees, for his
                               own personal benefit ......................................................... 20

                  b.    There is Insufficient Evidence to Establish That Mr. Hickey
                        Had the Requisite Criminal Intent ................................................. 22

      B.    Even if the Court Chooses Not to Enter a Judgment of Acquittal, The Court
            Should Set Aside The Jury's Verdict And Grant A New Trial ............................. 23

            1.    Mr. Hickey Is Entitled to a New Trial Because it is Clear, Based on
                  the Weight of the Evidence and Credibility of the Witnesses, That
                  the Jury Reached a Seriously Erroneous Result in Returning a
                  Guilty Verdict ....................................................................................... 23

                  a.    The Full Weight of the Evidence Favors a Finding That
                        There Was No Scheme to Defraud Fund I Investors on or
                        After July 16, 1992, as the Statute of Limitations Requires ......... 23

                  b.    The Evidence Strongly Weighs in Favor of a Finding That
                        Mr. Hickey At No Time Engaged In A Scheme to Defraud
                        Fund I or Fund II Investors. .......................................................... 25

            2.    Mr. Hickey Is Entitled to a New Trial Because the Court Erred in
                  Permitting Evidence of Events Leading to the 1992 Settlement
                  Agreement with Wells Fargo ................................................................. 26

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

i.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL ET AL.
CR 97-0218 WHA

1

**TABLE OF CONTENTS**

(CONTINUED)

2

**PAGE**

3        3.    Mr. Hickey Is Entitled to a New Trial Because the Court Erred in Excluding Any Evidence of Relevant Events After September 1994....... 28

4        4.    Mr. Hickey Is Entitled to a New Trial Because the Court Erred in Not Giving a Statute of Limitations Instruction........................................ 29

5

6        5.    Mr. Hickey Is Entitled to a New Trial Because Counts Twelve And Thirteen Should Have Been Dismissed....................................................... 31

7        6.    Mr. Hickey Is Entitled to a New Trial Because Count Eight Should Have Been Dismissed Prior to the Commencement of Trial ................... 32

8        7.    Mr. Hickey Is Entitled to a New Trial Because The Case Should Not Have Proceeded During the Pendency of the Interlocutory

9             Appeal .......................................................................................................... 32

10       8.    Mr. Hickey Is Entitled to a New Trial Because the Indictment Should Have Been Dismissed for Violation of the Speedy Trial Act....... 33

11       9.    Mr. Hickey Is Entitled to a New Trial Because the Indictment Should Have Been Dismissed ................................................................... 33

12  IV.    CONCLUSION............................................................................................................. 33

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

ii.

1

## TABLE OF AUTHORITIES

2

PAGE

3 **CASES**

4 *Carroll v. United States,*
  326 F.2d 72 (9th Cir. 1964).................................................................. 4, 6

5 *Johnson v. Zerbst,*
6 304 U.S. 458 (1938)............................................................................... 30

7 *Pendergast v. United States,*
  317 U.S. 412 (1942).......................................................................... 4, 7

8 *United States v. Alexander,*
  48 F.3d 1477 (9th Cir. 1995)................................................................ 3

9 *United States v. Alston,*
  974 F.2d 1206 (9th Cir. 1992)............................................................. 23

10 *United States v. Doherty,*
11 867 F.2d 47 (1st Cir. 1989)............................................................. 7, 30

*United States v. Figueroa-Paz,*
12 468 F.2d 1055 (9th Cir. 1972)............................................................... 3

13 *United States v. Fuchs,*
  218 F.3d 957 (9th Cir. 2000)................................... 7, 24, 25, 30, 31

14 *United States v. Kellington,*
  217 F.3d 1084 (9th Cir. 2000)...................................................... 23, 25

15 *United States v. O'Hagan,*
16 139 F.3d 641 (11th Cir. 1998)............................................................... 4

*United States v. Olano,*
17 507 U.S. 725 (1993)....................................................................... 30, 31

18 *United States v. Ponce,*
  51 F.3d 820 (9th Cir. 1995)................................................................... 3

19 *United States v. Shirley,*
  884 F.2d 1130 (9th Cir.1989)................................................................ 3

20 *United States v. Talbert,*
21 710 F.2d 528 (9th Cir. 1983), *cert. denied,* 464 U.S. 1052 (1984)............................................. 3

*United States v. Tavakkoly,*
22 238 F.3d 1062 (9th Cir. 2001)............................................................ 31

23 *Yates v. United States,*
  354 U.S. 298, 312 (1957), *overruled on other grounds, Burks v. United States,*
24 437 U.S. 1 (1978) ....................................................................... 7, 24, 31

25 **STATUTES**

26 15 U.S.C. § 78ff ............................................................................... 1, 2

15 U.S.C. § 78j(b) ........................................................................... 1, 2

27 17 C.F.R. § 240.10b-5 ..................................................................... 1, 2, 4

28 18 U.S.C. § 2 ....................................................................................... 1

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

iii.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

18 U.S.C. § 1343 ........................................................................................................... 1

18 U.S.C. § 1341 ........................................................................................................... 1

18 U.S.C. § 3161 *et. seq.* ............................................................................................ 33

18 U.S.C. § 3282 ....................................................................................................... 4, 7

**RULES**

Federal Rules of Criminal Procedure

Rule 29 ............................................................................................... 2, 3, 24, 25

Rule 29(d) ............................................................................................................. 23

Rule 33 .............................................................................. 2, 12, 16, 20, 23, 24

Rule 52(a) ..................................................................................................... 23, 30

Rule 52(b) ..................................................................................................... 30, 31

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

iv.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

## I.      INTRODUCTION

On November 18, 2005, a jury returned a guilty verdict against John A. Hickey for eight counts of mail fraud in violation of 18 U.S.C. 1341 and two counts of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff; 17 C.F.R. §240.10b-5; 18 U.S.C. §2. Mr. Hickey moves for a judgment of acquittal because the evidence admitted at trial is insufficient to sustain the conviction. Mr. Hickey's conviction as to Count Twelve is barred by the statute of limitations because the government failed to prove conduct occurring within the applicable limitations period. As to all counts, the evidence did not support the existence of a scheme to defraud investors, nor did it establish that Mr. Hickey had the requisite criminal intent.

Mr. Hickey also moves, in the alternative, for a new trial on nine independent grounds. First, the weight of the evidence makes it clear that the jury reached a seriously erroneous result. Second, the Court erred in permitting evidence of Mr. Hickey's purported bad character pertaining to the Wells Fargo Bank litigation. Third, the Court erred in excluding any evidence of relevant events after September 1994. Fourth, the Court erred in not giving a statute of limitations instruction. Fifth, Counts Twelve And Thirteen should have been dismissed prior to the commencement of trial. Sixth, Count Eight should have been dismissed prior to the commencement of trial. Seventh, the case should not have proceeded during the pendency of the interlocutory appeal. Eighth, the Indictment should have been dismissed for violation of the Speedy Trial Act. Ninth, the Indictment should have been dismissed.

## II.     BACKGROUND

The original indictment in this case, which the grand jury returned on July 16, 1997, charged Mr. Hickey with fifteen counts alleging violations of the federal securities laws (Title 15, U.S.C. §§ 78j(b) and 78ffa, and Title 17, C.F.R., § 240.10b-5); fifteen counts of mail fraud (in violation of 18 U.S.C. § 1341); and two counts of wire fraud (in violation of 18 U.S.C. § 1343). On January 9, 2001, the grand jury returned a superseding indictment containing only eleven mail fraud counts and dropping all previous counts of securities fraud and wire fraud. The indictment was once again superseded on September 22, 2004. The second superseding indictment was identical in substance to the January 9, 2001, superseding indictment, except that

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO
978618 v1/SF
1.
DEF.'s MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL*
CR 97-0218 WHA

1  it included *Blakely* sentencing factor allegations.  Likewise, the September 22, 2004, superseding

2  indictment contained no counts alleging securities fraud violations.

3          On April 27, 2005, the grand jury returned a third superseding indictment (the

4  "Indictment"), which contained the same eleven counts as the superseded indictment but added

5  two new counts, Counts Twelve and Thirteen, alleging that Mr. Hickey violated the federal

6  securities laws (Title 15, U.S.C. §§ 78j(b) and 78ffa, and Title 17, C.F.R., § 240.10b-5) and aided

7  and abetted such violations.  The Indictment alleges that Mr. Hickey, along with Mamie Tang,

8  controlled numerous corporations and partnerships that were in the business of investing in and

9  developing real estate, including Continental Capital Secured Principal With Income Fund

10  ("Fund I"), Continental Capital Income Fund II ("Fund II"), and Continental Capital Income

11  Fund, Inc. ("Fund III").  The Indictment further alleges that, during the period June 1991 through

12  September 1994, Mr. Hickey intentionally devised a scheme and artifice to defraud investors in

13  those funds as to a material matter and to obtain money and property by means of materially false

14  and fraudulent pretenses, representations, and promises, and the concealment of material facts.

15  Specifically, mail fraud counts One, Two, and Three, and securities fraud count Twelve, related

16  to Fund I.  The remaining mail fraud counts, Four through Eleven, and securities fraud count,

17  Count Thirteen, related to Fund II.  At the pretrial conference, the Court dismissed Counts One

18  and Two of the Superseding Indictment on statute of limitations grounds.

19          Mr. Hickey's trial began on September 26, 2005.  At the close of the government's

20  evidence, Mr. Hickey moved for a judgment of acquittal under Rule 29 of the Federal Rules of

21  Criminal Procedure.  The Court denied the motion.  Before the case was submitted to the jury, the

22  Court granted the government's own motion to dismiss Count Three based upon its failure to

23  introduce any evidence of a "mailing" in support of that count.  The parties made closing

24  arguments and the Court charted the jury on Tuesday, November 15, 2005.  On the afternoon of

25  Friday, November 18, 2005, the jury returned a guilty verdict as to all counts (i.e., Counts Four

26  through Thirteen) against Mr. Hickey.  As provided in Rules 29 and 33, Mr. Hickey made a

27  timely request, granted by the Court, for an extension of time in which to file motions for a

28  judgment of acquittal and for a new trial.

III. **ARGUMENT**

   A.   **The Court Should Set Aside The Verdict And Enter A Judgment Of Acquittal.**

Rule 29 of the Federal Rules of Criminal Procedure empowers this Court to set aside the jury's guilty verdict and enter judgment of acquittal in favor of Mr. Hickey "if the evidence is insufficient to sustain a conviction" of the offense charged in the Indictment.  Fed. R. Crim. P. 29(a), (c).   A defendant is entitled to a judgment of acquittal if "no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt."  *United States v. Ponce*, 51 F.3d 820, 832 (9th Cir. 1995) (citing *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir.1989)).  The court is to review a motion for judgment of acquittal "in the same manner as a challenge to the sufficiency of the evidence."  *Shirley*, 884 F.2d at 1134  (citing *United States v. Talbert*, 710 F.2d 528, 530 (9th Cir. 1983), *cert. denied*, 464 U.S. 1052 (1984).

Counts One, Two, Three, and Twelve of the Indictment alleged conduct related to Fund I. Prior to the jury's deliberations, Counts One, Two, and Three were dismissed, leaving Count Twelve as the only count related to Fund I for the jury's consideration.  However, the verdict as to Count Twelve cannot stand when the evidence is assessed in light of the statute of limitations. The government failed to prove that the alleged conduct as to Fund I occurred after July 16, 1997—the time period dictated by the five-year statute of limitations.  Moreover, as a matter of law there was insufficient evidence for a reasonable jury to find beyond a reasonable doubt that Mr. Hickey *at any time* committed mail fraud or securities fraud related to either Funds I or II.[1] Therefore, the Court should enter a judgment of acquittal in favor of Mr. Hickey.

---

[1] Although Mr. Hickey presented evidence in his defense after the court denied his initial Rule 29 motion at the end of the government's case, he has not waived his right to renew the same motion at the close of the case.  Furthermore, "[o]n review of a renewed motion for acquittal made at the conclusion of the defendant's case, all the evidence--including the evidence presented by the defendant--can be considered.")  *United States v. Alexander*, 48 F.3d 1477, 1490 (9th Cir. 1995) (citing *United States v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir. 1972).

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

3.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1      **1.   Mr. Hickey's Conviction on Count Twelve is Barred by the Statute of**
         **Limitations Because the Government Failed to Prove Conduct**
2           **Pertaining to Fund I Which Violated The Statute After July 16, 1992.**

3      Count Twelve charges a criminal violation of the securities fraud laws to

4  which the general federal criminal statute of limitations applies. It requires that an indictment be

5  returned within five years of the conduct which forms the basis of the charge. *See* 18 U.S.C. §

6  3282; *see also United States v. O'Hagan*, 139 F.3d 641, 651 (11th Cir. 1998) (applying five year

7  statute of limitations in context of *criminal* securities and mail fraud charges). The initial

8  indictment against Mr. Hickey was returned on July 17, 1997. In the absence of some exception,

9  therefore, the operative cut-off date is July 16, 1992.

10      The government can avoid running afoul of the statute of limitations only if it proved that

11  the alleged criminal conduct was committed on or after July 16, 1992. The statute of limitations

12  for securities fraud "begins to run when the offense is completed." *Carroll v. United States*, 326

13  F.2d 72, 86 (9th Cir. 1964) (citing *Pendergast v. United States*, 317 U.S. 412 (1942)).

14      The Indictment contains four counts – three mail fraud counts and one securities fraud

15  count – describing alleged acts in furtherance of the scheme to defraud relating to Fund I. Two of

16  the mail fraud counts, Counts One and Two, were dismissed prior to the commencement of the

17  trial for failure to meet the statute of limitations. The third mail fraud count alleging conduct

18  relating to Fund I – Count III – was dismissed prior to closing arguments at the government's

19  request based upon the government's failure to introduce any evidence of this alleged mailing.

20  (Tr. 11/14/05 3098:10-3099:8.) Thus, only remaining count related to Fund I – Count Twelve –

21  alleges a violation of the securities fraud statutes as follows:

22           ***Beginning on or about June 28, 1991, and continuing until or***
         ***about September 19, 1994***, in the Northern District of California
23           and elsewhere, the defendant JOHN A. HICKEY and others, did
         knowingly and willfully, directly and indirectly, by the use of the
24           means and instrumentalities of interstate commerce and the mails,
         use and employ manipulative and deceptive devices and
25           contrivances in connection with the purchase and sale of securities,
         ***namely, limited partnership units in Fund I***, in violation of Title
26           17, Code of Federal Regulations, Section 240.10b-5, by (a)
         employing devices, schemes, and artifices to defraud as to a
27           material matter; (b) making and causing others to make untrue
         statements of material fact and omitting to state material facts
28           necessary in order to make the statements made, in light of the

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO
  978618 v1/SF       4.        DEF.'s MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1      circumstances under which they were made, not misleading; and (c)
engaging in acts, practices, and courses of business which operated
2      and would operate as a fraud and deceit upon the members of the
investing public who purchased limited partnership units in Fund I.

3

4    (Indictment, Count Twelve, pp. 12-13 (emphasis added).)

5        It is important to make one elemental point clear from the outset: Funds I, II, and III were

6   separate and distinct from one another. Thus, between June 28, 1991 and June 28, 1992,

7   Mr. Hickey raised $5 million through the sale of limited partnership interests in Fund I. The

8   Private Placement Memorandum ("PPM") for Fund I states that the general partner of the Fund I

9   limited partnership was Continental Capital Securities Group ("CCSG") which was 50% owned

10  by Mr. Hickey and 50% owned by Mamie Tang. Fund I identified specific properties, one or

11  more of which would secure the loan made by the limited partnership to the borrower, who was

12  an affiliate of the general partner (the "Security Properties"). In the case of Fund I, the Sonoma

13  property was the Security Property.

14        Fund II, in turn, was sold beginning July 18, 1992 and raised approximately $15 million.

15  The PPM identifies Continental Capital Financial Group ("CCFG") as the Fund II limited

16  partnership's general partner. Unlike the Fund I PPM, the Fund II PPM did not identify specific

17  Security Properties. The Security Properties which were eventually identified for Fund II, Napa

18  Oaks I and Napa Oaks II, were different than the Security Property associated with Fund I.

19        Fund III was intended to raise $50 million but never got off the ground. There are no

20  counts in the Indictment relating to Fund III, and the government did not offer any evidence that

21  anyone even invested in Fund III, much less that any Fund III investors were defrauded.

22  Therefore, the allegations in the Indictment relating to Fund III were extraneous to the case.

23        In the Indictment, the government alleged that conduct relating to Count Twelve began on

24  June 28, 1991 and continued until September 19, 1994. (Indictment, Count Twelve, p. 12.) At

25  trial, however, the government failed to offer any evidence regarding criminal conduct related to

26  Fund I that occurred after June 28, 1992. Tony Jones – the Continental Capital wholesaler whose

27  father was the last Fund I investor – testified that in June 1992, the total amount of investment

28  necessary to close Fund I was $14,258.49 (Tr. 10/4/05 308:9-23, Ex. 32); that his father invested

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF          5.          DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1    that amount (Tr. 10/4/05 308:25-309:2); and that when his father invested that amount, Fund I

2    closed. (Tr. 10/4/05 309:3-6.) Further, Mr. Jones received a letter from Stuart Burchard – head

3    of investor relations for the Continental Capital entities – with all of the information that

4    evidenced Mr. Jones' father investment in Fund I, including a subscription booklet, which

5    according to Mr. Jones, "is the document that's required to actually purchase under the limited

6    partnership" and which bore Mr. Jones' father signature dated June 28, 1992. (Tr. 10/4/05

7    309:10-16, 311:12-312:3, Ex. 35.) Thus, the evidence at trial established that, with respect to

8    Fund I, the statute of limitations began to run on June 28, 1992, the date that Fund I closed.

9    Count Twelve, which was initially brought on July 17, 1997, therefore should be barred.

10         The government may attempt to argue that Fund I, Fund II, and even Fund III were all part

11    of one scheme to defraud investors, and that the statute of limitations therefore began to run on

12    September 19, 1994, as alleged in the Indictment. However, it is undisputed that Mr. Hickey's

13    duty to disclose information with respect to Fund I ended once the offering closed. Moreover,

14    subsequent acts related to Fund II are irrelevant to calculating the start date of the statute of

15    limitations with respect to Fund I because Fund I and Fund II were different funds altogether.

16    Indeed, Fund I and Fund II had different general partners (CCSG and CCFG, respectively), had

17    different affiliated borrowers (Continental Capital Properties I, Inc. "CCP-I" and J.M. Regional

18    ("JMR"), respectively), involved different Security Properties, were offered through different

19    PPMs which were prepared by different law firms, and were supported by guarantees consisting

20    of different underlying assets. In short, Fund I and Fund II were totally independent of each

21    other, were purportedly different schemes, and were presented as such at trial by the government.

22         Furthermore, the fact that correspondence to Fund I investors regarding their investment

23    post-dated the close of Fund I is irrelevant to the statute of limitations analysis. *See Carroll v.*

24    *United States*, 326 F.2d 72, 86 (9th Cir. 1964). In that case, the defendants were charged with

25    fraudulently purchasing securities, where the sale negotiation and purchase occurred more than

26    five years before the indictment was filed. To overcome the statute of limitations, the prosecution

27    argued that the scheme to defraud was wider in scope and included the defendants' later use of

28    the mail system to receive the certificates that were purchased. However, the court disagreed,

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

6.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1  finding that the charged crime only included the acts of offer, acceptance and payment pursuant

2  to the securities purchase. Even though the items mailed were in fact the purchased securities at

3  issue, the court held that the use of the mail system was "merely incidental and collateral" to the

4  scheme, barring the government's prosecution under the statute of limitations. *Id.* at 86 (citing

5  *Pendergast v. United States* 317 U.S. 412 (1942).

6          Because the government failed to present any evidence of any criminal conduct related to

7  Fund I occurring on or after July 16, 1992, the conviction on Count Twelve is barred by the

8  applicable statute of limitations. The statute of limitations itself as well as case law confirms that

9  a district court cannot allow a verdict to stand if there is insufficient evidence that criminal

10  conduct occurred within the limitations period. The statute provides that "*no person **shall be***

11  ***prosecuted, tried, or punished*** for any offense, not capital, unless the indictment is found or the

12  information is instituted within five years next after such offense shall have been committed." 18

13  U.S.C. § 3282 (emphasis added); *see also United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir.

14  2000) (reversing conspiracy conviction because jury could have based its verdict on overt acts

15  occurring outside of limitations period, which would be a "legally inadequate ground") (citing

16  *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds, Burks v. United*

17  *States*, 437 U.S. 1, 98 (1978)); *United States v. Doherty*, 867 F.2d 47, 60-61 (1st Cir. 1989)

18  (holding that prosecution of one defendant was barred by the statute of limitations where no

19  evidence was presented at trial that any overt acts in furtherance of the conspiracy had occurred

20  after the five year statute of limitations period).

21          Despite allegations in the Indictment to the contrary, the evidence at trial was that the

22  alleged scheme to defraud Fund I investors ended on June 28, 1992, in other words, before the

23  critical date of July 16, 1992. Therefore, the verdict as to Count Twelve cannot survive the

24  statute of limitations impediment, and a judgment of acquittal should be entered in favor of Mr.

25  Hickey on that count.

26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

7.

DEF.'s MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

2.   **The Evidence Admitted at Trial Does Not Prove That Mr. Hickey At Any Time Devised A Scheme To Defraud Investors.**

The gravamen of the Indictment is that Mr. Hickey and others defrauded investors in Fund I and Fund II, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.   More specifically, Mr. Hickey allegedly (a) made misrepresentations in the offering memoranda for Fund I and Fund II in order to induce investors to purchase limited partnership units; (b) failed to invest money provided by investors in Fund I and Fund II in the manner descried in the offering memoranda; and (c) concealed from investors in Fund I and Fund II the true manner in which their money was being spent.

Broadly speaking, an acquittal on all counts is warranted in this case because the evidence at trial was insufficient on two fundamental elements.   First, the evidence at trial was insufficient to prove beyond a reasonable doubt that there was any scheme to defraud investors who invested in Fund I or Fund II.   Second, even if such a scheme had been proved, there is insufficient evidence that Mr. Hickey had the necessary criminal intent.

a.   **There is Insufficient Evidence to Establish the Scheme to Defraud as Charged in the Indictment.**

It appears that the government's case relies on a number of factual contentions underlying three themes presented at trial – the Guarantee, the Security, and the Use of Funds – that, if proved, the government believes would be sufficient as a matter of law to sustain a conviction for the criminal mail and securities fraud alleged in this case.   Below we take each contention in turn, first summarizing it in the light most favorable to the government, then discussing why the evidence does not fully support, or actually refutes, the contention.   In addition, we explain why the evidence admitted is insufficient, as a matter of law, to sustain this conviction for the charged crimes of mail and securities fraud.

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

8.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL*
CR 97-0218 WHA

(1) **Government Contention #1: Mr. Hickey's personal financial statements underlying the guarantee were false because they (1) failed to disclose the Wells Fargo liability, (2) falsely included the value of the Vacaville property, and (3) conflicted with his sworn declaration reflecting a negative net worth.**

At trial, the government contended that the PPM for Fund I and Fund II made a number of representations related to the guarantee which were false. Specifically, Mr. Hickey and Ms. Tang each offered a personal guarantee that the limited partners would earn at least 12% interest per year and would receive the return of all their principal within five years. (Exs. 34, 36.) The unaudited financial statements of Mr. Hickey and Ms. Tang, which were incorporated into the PPM for both Fund I and Fund II, reflected a combined personal net worth of over $20 million at the time Fund I was sold, and over $22 million at the time Fund II was sold. (Ex. 34 at B-2; Ex. 36 at B-8.) As to Mr. Hickey, the Fund I PPM included his unaudited financial statement dated as of June 28, 1991 reflecting a net worth of $11,955,575. The Fund II PPM included Mr. Hickey's unaudited financial statement dated as of February 29, 1992 reflecting a net worth of $12,282,378. In both cases, the bulk of Mr. Hickey's net worth was comprised of unlisted securities which represented 50% net equity ownership interests in the general partner of the limited partnerships and Continental Capital Properties I, Inc., an affiliated borrower. (*Id.*)

The government contends that the guarantees were fraudulent because they were supported by Mr. Hickey and Ms. Tang's personal net worth, which was overstated. Specifically, the government presented evidence that Mr. Hickey's financial statements did not reflect the impact of litigation with Wells Fargo Bank, namely: (1) that the potential liability during the pendency of the lawsuit, as well as the stipulated judgment which resulted from the lawsuit, was not reflected in Mr. Hickey's financial statements; (2) that one of the properties which comprised part of Mr. Hickey's net worth – the Vacaville property – was deeded to Wells Fargo as a result of the lawsuit, yet no decrease in net worth was ever disclosed; and (3) that, as part of the settlement with Wells Fargo, Mr. Hickey signed a declaration under oath stating that he had a *negative* net worth of approximately $18 million at the same time he claimed to Fund I and

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

9.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   Fund II investors that his combined net worth with Ms. Tang was *in excess* of $20 million and
2   $22 million, respectively.

3         Wells Fargo liability.  The evidence pertaining to the non-disclosure of the potential Wells
4   Fargo liability and the subsequent stipulated judgment of approximately $6.5 million does not
5   establish fraud.  To the contrary, Janice Harwell, the lawyer who represented Wells Fargo,
6   testified that throughout the negotiations to settle the dispute, Mr. Hickey demanded a two year
7   delay in payment of any monies to Wells Fargo because such delay would enable him to develop
8   the Sonoma property.  (Tr. 10/3/05 216-17.)  Indeed, the June 8, 1992 settlement agreement
9   reflects the parties' agreement to defer the payment for two years. (Ex. 1, ¶ 4.)  Accordingly,
10  Wells Fargo was entitled to collect payment on the stipulated judgment as of June 8, 1994, at
11  which time the Continental Capital entities remained operational.  However, the government
12  failed to establish that Wells Fargo ever attempted to, or actually did, enforce the stipulated
13  judgment.  In other words, the government failed to establish that the limited partnership ever
14  suffered a loss or any adverse consequence as a result of the Wells Fargo liability.  The notion
15  that the limited partnership never suffered any adverse consequence related to the Wells Fargo
16  litigation is consistent with the manner in which the parties structured the settlement agreement.
17  Indeed, Ms. Harwell acknowledged that Wells Fargo was restricted from accessing Fund 1
18  monies. (Tr. 10/3/05 165.)

19        Vacaville.  The evidence at trial showed that the Vacaville property was transferred to
20  Wells Fargo by quitclaim deed on May 5, 1992. (Ex. 28.)  However, of critical importance is that
21  no evidence was presented which conclusively established the composition of the "unlisted
22  securities" identified in Mr. Hickey's personal financial statements, and therefore, it is impossible
23  to determine the impact of the loss of Vacaville on the financial statements or whether another
24  event might have made up for the loss.  Continental Capital's auditor, Lynn Dillender, testified
25  that the personal financial statements, which are a balance sheet or "snapshot" as of a particular
26  date, do not identify which properties constitute the unlisted securities. (Tr. 10/17/05 1904.)
27  Tony Jones, the Continental Capital wholesaler, had a similar understanding, namely, that
28  financial statements do not purport to represent the financial condition of a person or entity at any

1    point in time before or after the date of the financial statement. (Tr. 10/6/05 609.)  Even the

2    government's forensic accountant, Lee Baly, testified that he had "no idea" what properties

3    comprised the unlisted securities identified in Mr. Hickey's June 28, 1991 personal financial

4    statement (Tr. 10/18/05 2155), other than to assume that the similarity in numbers between that

5    statement and the personal financial statement dated as of February 29, 1992, which was included

6    in the Fund II PPM.  Of course, Mr. Baly's only knowledge of the properties underlying

7    Mr. Hickey's February 29, 1992 financial statement was derived from Exhibit 133, which the

8    Court determined was inadmissible because of several hearsay problems.[2] (Tr. 10/18/05 2075.)

9    Furthermore, Mr. Baly testified that he did not know whether any properties were sold or

10   acquired between June 28, 1991 and February 29, 1992. (Tr. 10/18/05 2155.)  Therefore, it was

11   impossible for a jury to determine, for example, whether value lost in Vacaville in February 1992

12   was replaced by the 70+ acre parcel that was part of Napa Oaks I, which was acquired in

13   February 1992.

14       At trial, the government also contended that Mr. Hickey falsely stated that he had realized

15   a $6-7 million gain on the sale of Vacaville to a third party.  According to the government, the

16   import of this alleged misrepresentation was that the gain allegedly was reflected in a financial

17   statement attached to a letter which Mr. Hickey wrote to Financial Services Exchange, the entity

18   which conducted due diligence on Fund I and Fund II, as support for the viability of the personal

19   guarantees.  However, Tony Jones testified that he did not have any knowledge of the specific

20   "current assets" listed in those financial statements, and therefore had no way knowing the source

21   of that cash. (Tr. 10/6/05 709-12.)

22       <u>Sworn statement of negative net worth</u>.  At trial, the government presented evidence that,

23   in connection with the Wells Fargo settlement, Mr. Hickey had executed a declaration under oath

24   stating that his total combined net worth along with Ms. Tang was negative $18,575,406. (Tr.

25

26   [2] As with all evidence excluded on hearsay grounds, Exhibit 133 was unreliable because the
     defendant had no opportunity to test the reliability of any of the statements contained therein.
     Exhibit 133 was even more problematic, however, because of the manner in which it came to be
27   the focal point of Mr. Baly's analysis.  Indeed, Mr. Baly testified that he did not incorporate
     Exhibit 133 into his February 2002 report, though he was aware of it as far back as 1995.  Instead,
28   one of the government lawyers prosecuting this case "reminded" Mr. Baly that Exhibit 133 would
     be relevant to his analysis. (Tr. 10/18/05 2154.)

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                    11.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

10/3/05 178:25-179:14.)  Based upon this evidence, the government argued that Mr. Hickey misrepresented his net worth on the financial statements in the PPMs, which reflected a combined positive net worth of over $20 million.  The evidence, however, is contrary to that conclusion. Ms. Harwell testified that it was clear that the assets listed on the schedules which were attached to Mr. Hickey's declaration were valued on a cost basis. (Tr. 10/3/05 204.)  Indeed, during the settlement negotiations, Ms. Harwell had insisted on using the cost method of valuing assets instead of the developmental method because valuations other than cost basis "were to some extent a matter of opinion." (Tr. 10/3/05 204-05.)  On the other hand, the Fund I and Fund II PPMs clearly stated that the value of the Security Properties (which comprised the bulk of the unlisted securities listed in Mr. Hickey's personal financial statements) was based upon the developmental method (Ex. 34, p. 14; Ex. 36, p. 14) and then goes on to explain the developmental method.  (*Id.*)  Even Ms. Harwell admitted that she had knowledge of the difference between these methods, insofar as she had seen an appraisal for the Sonoma property for approximately $6 million as of July 1989 and approximately $9 million as of July 1992 using the development approach, presumably in connection with Wells Fargo's agreement not to enforce the judgment in order to allow Mr. Hickey time to develop the Sonoma property.  (Tr. 10/3/05 229-31.)

At the end of the day, the government's case regarding the guarantees and the personal financial statements underlying them was based upon the speculation and flawed analysis of the government's forensic expert Baly.  Mr. Baly testified that there were two schedules attached to the May 16, 1994 Gruber letter (Exhibit 133) which purported to explain the composition of the February 29, 1992 financial statements.  (Tr. 10/19/05 2244-46.)  Mr. Baly elected to use only one of those schedules and ignored the other one. (Tr. 10/19/05 2229.)  The Gruber schedule that Mr. Baly did *not* use indicated a developer's profit totaling an additional $17 million in value that was properly added to Mr. Hickey and Ms. Tang's combined net worth. (Tr. 10/19/05 2229-30.) Therefore, the total net worth was actually $44 million.  Subtracting Vacaville, Astor, and the Sonoma judgment from the net worth of $44 million, the combined net worth was still $31 million. (Tr. 10/19/05 2232-33.)  Indeed, the evidence established that the developer's profit

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO
978618 v1/SF
12.
DEF.'s MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   figures in the exhibit which Mr. Baly did not consider were based upon the appraisals prepared by
2   Mr. Gimmy, and that the concept of a developer's profit is standard in the industry.  Therefore,
3   the only possible conclusion based upon the evidence is that the calculations of Mr. Hickey's net
4   worth were in part based upon developer's profit figures which Mr. Baly simply ignored.

5       Mr. Baly also admitted that he was unsure about the application of discount factors, that
6   he never bothered to determine the methodology that had been used in the letter, and that he made
7   assumptions as to what it all meant.  (Tr. 10/19/05 2231-32.)  Indeed, there was no explanation in
8   the Gruber letter of what constituted the components of discount.  Mr. Baly acknowledged that a
9   discount may be applied for any number of circumstances, including risk, contingent liability and
10  marketability of a particular property.  (Tr. 10/19/05 2266-67.)  Thus, although the differential
11  between $44 million and $20 million was sufficient to cover all of the contingencies identified by
12  Mr. Baly – e.g., the Wells Fargo judgment and the loss of Vacaville – he had no way of knowing
13  whether those factors were considered at the time the exhibit to the Gruber letter was prepared.
14  (Tr. 10/19/05 2267-68.)

15      In short, the underpinning of the government's guarantee allegations—i.e., the "unlisted
16  securities" comprising the bulk of Mr. Hickey's net worth as reflected in his personal financial
17  statements contained in the PPM—remained a mystery throughout the trial.  Consequently,
18  proving the falsity of those financial statements was an impossibility.

19                          (2)   **Government Contention #2:   The loans underlying**
                                  **Fund I and Fund II were not secured as represented.**
20

21      At trial, the government contended that the PPM represented
22  that the general partner for each of the funds intended to make Secured Mortgage Loans to each
23  respective borrower which would be secured by a first or second deed of trust on the Security
24  Properties.  According to the government, the loans made with Fund I and Fund II monies were
25  not secured as represented in the PPM.

26      Fund I.  The Fund I PPM stated that the general partner "intends to make its first three
27  Secured Mortgage Loans to [CCP-I], each of which will be secured by one or more of the
28  following properties[.]"  (Ex. 34, p. 32.)  The PPM goes on to identify three Security Properties,

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                             13.                   DEF.'S MPA ISO MOTION FOR
                                                              JUDGMENT OF ACQUITTAL *ET AL.*
                                                              CR 97-0218 WHA

1    namely, the Sonoma and Vacaville properties, both of which had been purchased by an affiliate of

2    CCP-I when the PPM went into circulation, and the Oak Tree Ranch Property located in

3    Calaveras County, which was described as not yet purchased by any Continental Capital affiliate.

4    (Ex. 34, pp. 32-35.)

5            At trial, it was established that Continental Capital Real Estate ("CCRE"), a Continental

6    Capital affiliate, purchased the Sonoma property in February 1990, at which time a first deed of

7    trust in the amount of approximately $1 million was executed in favor of the seller. (Tr. 10/6/05

8    800-05, Ex. 220A-GG.) The Sonoma property consisted of three parcels of land totaling 24.6

9    acres. Parcel 1 was by far the largest parcel, measuring 19.58 and 3.82 acres, while Parcels 2 and

10   3 measured .59 acres combined. (Tr. 10/11/05 1193.) The government contends that the PPM

11   misrepresented the Security in part because CCRE transferred only Parcel 1 of the Sonoma

12   property to CCP-I, while title to Parcels 2 and 3 remained in CCRE. Moreover, in August 1991,

13   Fund I got a second deed of trust for $1.5 million for Parcel I only. Subsequently, on

14   December 18, 1991, Fund I's second deed of trust on Parcel 1 was subordinated to a third position

15   behind American California Bank, which was given a second deed of trust (behind the seller) for

16   $500,000. (Tr. 10/6/05 800-05, Ex. 220H.) On May 15, 1992, the Fund I deed of trust was

17   increased to $5 million and remained in third. (Tr. 10/6/05 805.)

18           In addition, the government contended that the PPM's representations regarding the

19   Security were false because neither the Vacaville nor the Oak Tree Ranch properties ever secured

20   the loan, insofar as the Vacaville property was deeded to Wells Fargo as a result of litigation and

21   Oak Tree Ranch was never acquired by any Continental Capital entity.

22           The fact that CCP-I acquired only Parcel 1 of the Sonoma property as security for the

23   entire amount of Fund I is undisputed. As to whether this fact caused the PPM to be false, it is

24   critical to consider other unrefuted evidence in the case. For instance, the Fund I PPM stated that

25   "The Partnership could make only one Secured Mortgage Loan" and that "there are no specific

26   limitations … on the percentage of Proceeds which may be invested in a single Security

27   Property." (Ex. 34 , p. 11.) Therefore, the fact that the Sonoma property might constitute the

28   entire security for Fund I was clearly disclosed in the PPM.

1    Consistent with these disclosures, broker-dealer Dave Wickersham and wholesaler Jones
2  both testified that no disclosure was required regarding the fact that Vacaville ultimately would
3  not be a Security Property. According to Mr. Jones, when he learned that Vacaville was not part
4  of Fund I, he was not concerned because the Sonoma property had sufficient value to carry the
5  entire fund. (Tr. 10/5/05 579-80.) In fact, he did not bother to inform his father – a Fund I
6  investor – about this fact. (*Id.* 578:12-16.) Likewise, Mr. Wickersham spoke with Mr. Hickey
7  about the fact that the Vacaville and Oak Tree Ranch properties would not secure the loan and
8  satisfied himself after seeing Sonoma appraisal that because Sonoma had sufficient value to
9  support the 70% loan-to-value ratio, no additional disclosure regarding Vacaville and Oak Tree
10  Ranch was necessary. (Tr. 10/7/05 952-54.)

11    Furthermore, the fact that CCP-I only acquired Parcel 1, cannot support the charges in this
12  case. Not only was Parcel 1 by far the largest of the parcels, and not only did the evidence
13  establish that all of the residential units – 34 townhouses and 71 single family homes – that were
14  planned for the Sonoma property would lie within Parcel 1, (Tr. 10/11/05 1193-94, Ex. 194), but
15  also, Parcels 2 and 3 remained in title of CCRE, which was controlled by Mr. Hickey and Ms.
16  Tang (Tr. 10/18/05 2183), who had given the investors a personal guarantee in any event.

17    With regard to the subordination of the deed of trust in favor of Fund I behind two other
18  liens totaling $1.5 million, according to the defense expert, Denis Rice, the real protection to
19  investors was not necessarily having a first or second deed of trust, particularly since the PPM
20  contemplates the possibility of multiple encumbrances on the Security Property at various times.
21  Rather, the 70% loan-to-value ratio limit required for each loan was the key protection for
22  investors, which was met with respect to the Sonoma property. (Tr. 11/9/05 2835-36) Tony
23  Jones' testimony was also consistent with this view. (Tr. 10/6/05 580.) At the end of the day, the
24  Sonoma property held sufficient value to support all of the liens, including the lien in favor of
25  Fund I.

26    Related to the Fund I Security allegations, the government contends that the PPM failed to
27  disclose that there was a moratorium on developing the Sonoma property as of November 1991,
28  as well as delays because the property was subject to the Williamson Act. However, the delays,

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                                    15.                    DEF.'S MPA ISO MOTION FOR
                                                                      JUDGMENT OF ACQUITTAL *ET AL.*
                                                                      CR 97-0218 WHA

1   in and of themselves, were not a misrepresentation of any kind.  According to Tony Jones, there

2   was no guarantee that Sonoma would be finished by September 1992.  The only guarantee was

3   for monthly interest payments (and a return of principal in 60 months). (Tr. 10/6/05 590.)

4   Moreover, the evidence overwhelmingly established that, despite delays, the Sonoma project was

5   viable and on track.  In his initial appraisal of the Sonoma property, appraiser Gimmy concluded

6   that enhancements to the raw land were feasible and valued the land on the developmental

7   method at $6,370,000 as of July 1989. (Tr. 10/11/05 1183-84, Ex. 192.)  Later, in generating a

8   letter dated December 30, 1991 (which post-dates the moratorium), Gimmy reaffirmed his pre-

9   moratorium valuation, stating  that he had reviewed other assignments conducted in the area and

10  had spoken with Sonoma city officials, who presumably were aware of the moratorium. (Ex. 194)

11  Indeed, Mr. Gimmy testified that he took the moratorium, as well as the Williamson Act, into

12  account when he prepared the Sonoma appraisals and did not believe that either issue was a major

13  impediment to development.  (Tr. 10/12/05 1257-60.)  Moreover, according to broker-dealer

14  Wickersham, even if there were delays in predevelopment, investors had no right to complain

15  until the end of 60 months, and even then had no right to complain about delays so long as their

16  principal was returned. (Tr. 10/7/05 972.)

17         Fund II.  The Fund II PPM stated that the general partner had not identified in proposed

18  Secured Mortgage Loan(s) on any specific property. (Ex. 36, p. 33.) However, later supplements

19  to Fund II identified Napa Oaks I, a 4-parcel property consisting of 80 acres of land and Napa

20  Oaks II, which consisted of 108 acres. (Exs. 38, 39.)  As with Fund I, the Fund II PPM stated that

21  the limited partnership would receive a first or second deed of trust secured by the Security

22  Properties, and that the loan-to-value ratio would not exceed 70%.

23         The government contends that the Fund II PPM misrepresented the Security because JMR

24  never received any interest in Napa Oaks I and therefore there was no deed of trust in favor of

25  Fund II, and because the Napa Oaks II appraisal was false.  At trial, the government established

26  the relevant ownership interest in Napa Oaks I as follows:

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

16.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1  • *Parcel 1.*  An agreement for the purchase of Napa Oaks I Parcel 1 (1.19 acres) dated as of
2  June 19, 1992 was never completed, and title remained with the seller.  Instead, Mr. Hickey
3  received an option. (Tr. 10/7/05 810-11, Ex. 222A-V.)

4  • *Parcel 2.*  On February 16, 1992, Mr. Hickey acquired an option to purchase Parcel 2 (70.18
5  acres), the largest of the Napa Oaks I parcels.  Later, an agreement dated August 16, 1992
6  superseded the February agreement.  The two agreements were identical except that the term
7  of the option was reduced from 36 to 30 months (since approximately six months had passed
8  between February and August) and the optionor was Continental Capital of Napa.  (Tr.
9  10/7/05 810-12, 819-22 Ex. 222A-V, 225.)

10  • *Parcel 3.*  A purchase agreement for Parcel 3 (1.39 acres) dated as of July 2, 1992 exists but
11  was not completed.  Ms. Tang ultimately purchased Parcel 3 on September 1, 1993.  (Tr.
12  10/7/05 810, 81213, Ex. 222A-V.)

13  • *Parcel 4.*  On July 14, 1992, Mr. Hickey entered into an agreement to purchase Parcel 4 (7.75
14  acres) which was never completed. Instead, Mr. Hickey assigned his rights to Ms. Tang. (Tr.
15  10/7/05 810, 813-15, Ex. 222A-V.)  On April 8, 1993, Ms. Tang and Mr. Hickey transferred
16  Parcel 4 to JMR as trustee for Private Equity Fund 1. (Tr. 10/7/05 817.)

17  Therefore, JMR never received any interest in Parcels 1, 2, or 3, and no deed of trust was ever
18  recorded on any of those parcels in favor of Fund II. JMR did receive an interest in Parcel 4, but
19  not in favor of Fund II.  In short, the government contends that an option to purchase two of the
20  Napa Oaks I parcels (instead of fee simple ownership) and ownership by Ms. Tang of the other
21  two Napa Oaks I parcels instead of ownership by JMR was inconsistent with the representations
22  regarding the Security in the Fund II PPM.

23         As with Fund I, other evidence presented at trial explains the circumstances of ownership
24  surrounding Napa Oaks I. First, the evidence at trial established that an option to purchase two of
25  the Napa Oaks I parcels was permissible under the PPM. Defense expert Denis Rice pointed out
26  that the PPM does not preclude the use of options or contract of sale as an interim step in securing
27  a property interest. (Tr. 11/9/05 2858-59)  The government's forensic accountant, Lee Baly,
28  stated that a contract for sale before filing of a grant deed would constitute an interest in the

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                                    17.                        DEF.'S MPA ISO MOTION FOR
                                                                           JUDGMENT OF ACQUITTAL *ET AL.*
                                                                           CR 97-0218 WHA

1    property, and that, as well, it is standard in the industry that an option to purchase property

2    constitutes an interest in that property. (Tr. 10/19/05 2265-66)  In the same vein, Arthur Gimmy,

3    the appraiser, testified that whether one has an option or fee simple interest in property is

4    irrelevant for purposes of appraisal, the developmental method, or what will be produced with the

5    property. (Tr. 10/11/05 1186.)  Indeed, one of the investors testified during the government's

6    direct as to his understanding, based upon reading the PPM, that Continental Capital was going to

7    acquire options to purchase property in Napa Valley (Tr. 10/13/05 1579), and further, that he

8    understood Fund II's objective was to acquire title to or options in raw land. (Tr. 10/13/05 1575)

9    Tony Jones also understood when he was selling limited partnership interests in Fund II that Napa

10   Oaks I was optioned.  (Tr. 10/6/05 614.)  Indeed, a wide cross section of the government's

11   witnesses understood that the PPM, in particular the Master Loan Agreement, permitted Napa

12   Oaks I to be optioned rather than owned in fee.  As for whether it was outside of the scope of the

13   PPM for any Napa Oaks I parcels to be owned by Ms. Tang instead of JMR, the fact is that the

14   investors had a potential claim to any asset owned by Ms. Tang through Ms. Tang's personal

15   guarantee.  Therefore, whether Ms. Tang owned the property of JMR did, the investors were

16   protected.

17           Napa Oaks II was purchased by JMR on October 16, 1992.  (Tr. 10/7/05 824-25, Ex.

18   223A-E.)  On the same day, the seller received a first deed of trust for $1.5 million, and Fund II

19   received a $1 million second deed of trust.  (Id.)  Later, on December 23, 1992, (i.e., once Mr.

20   Hickey obtained an appraisal for Napa Oaks II of $8.7 million consistent with the 70% loan-to-

21   value restriction stated in the PPM), Fund II's deed of trust was increased to $6 million.  (Id.)

22           The evidence regarding the "false" Napa Oaks II appraisal overwhelmingly showed that

23   the $8.7 million appraisal was valid.  Mr. Gimmy testified that he was out of town on

24   December 17, 2005, and as a result did not sign the "false" $8.7 million appraisal which

25   Mr. Hickey used with respect to Napa Oaks II.  (Tr. 10/11/05 1205, Ex. 196)  However,

26   Mr. Gimmy's signature *does* appear on a document dated December 17, 1992.  (Ex. 919.)

27   Although Mr. Gimmy disclaimed that the signature was his, he had no explanation as to how that

28   could be. (Tr. 11/14/05 3147.)  Furthermore, Mr. Gimmy acknowledged that he was in town on

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

18.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   December 16, 1992, the date of the Napa Oaks II inspection, as well as on December 18, 1992,

2   which is the date of the Sonoma property appraisal bearing his signature. (Tr. 11/14/05 3147-49,

3   Ex. 196, 198.)

4          Moreover, Mr. Gimmy testified that there was no reference on the December 24, 1992,

5   cover letter which made clear that the December 17, 1992 report was either a draft or had been

6   superseded, and that it was his practice to mark drafts in that manner. Indeed, there was no way

7   for anyone reading the December 24, 1992, letter to tell that it was a replacement for a prior

8   appraisal. (Tr. 10/12/05 1207, 1233-34.)

9          The government also contended that Napa Oaks II would never be developed because the

10  property fell outside of the rural urban line ("RUL") which meant that the City of Napa would not

11  approve the project for development.  In fact, the testimony at trial established that, although

12  convincing Napa to adjust the RUL was a formidable task, it certainly was possible. The Napa

13  Oaks II project manager, David Dolter, testified that until March 1993, he believed that the

14  prospects of extending the RUL for Napa Oaks II were good (Tr. 11/8/05 2532-33), and that his

15  attitude regarding the viability of developing Napa Oaks II changed over time, depending on the

16  City's attitude.  (Tr. 11/8/05 2598.)  Even after the prospects diminished, Dolter believed that

17  although it would be exceedingly difficult to adjust the RUL, he would not characterize the

18  project as "dead in the water." (Tr. 11/8/05 2574.)  Even the government's "star" witness on the

19  RUL issue, appraiser Gimmy, indicated that the RUL issue essentially amounted to having to take

20  additional steps to get a tentative map approved, and that if he had concluded that there was no

21  way to build Napa Oaks II, he would have concluded that the developmental value was $0, which

22  he did not do. (Tr. 10/12/05 1243.)  Moreover, because Napa's policy towards subdivision

23  development at the time was restrictive, if someone could get around the RUL issue, the value of

24  the project would be greatly enhanced. (Tr. 10/11/05 1197-98.)  Indeed, there were other

25  developers similarly situated to Mr. Hickey who were attempting to get their properties in the

26  RUL. (Tr. 10/12/05 1242-43.)

27

28

(3)   **Government Contention #3: The use of the funds was misrepresented because Mr. Hickey used the funds for general and administrative expenses, selling commissions, and management fees, for his own personal benefit.**

According to the government, Mr. Hickey used Fund I and Fund II investor money for unauthorized purposes, including paying the sales expenses associated with the offering (such as broker commissions) and paying the administrative expenses of the general partner. This was contrary to the PPM for Funds I and II, which represented the funds as "no load" and indicated that the funds would be used only to pay the obligation under the notes back to the partnership for the benefit of the investors; pay for predevelopment improvements on the properties; and acquire and refinance the security properties. At trial, the government pointed to the Investor Summary for both Funds I and II, which purported to summarize the investments and stated that the investments were " no load," and that all offering costs, commissions and costs of operating the program would be borne by the general partner. (Ex. 33, 37.) Further, the PPM indicates that "the General Partner or its Affiliates will pay all commission and fees to Selling Agents in connection with the sale of the units." (Ex. 34, p. 20; Ex. 36, p. 20.)

At trial, Mr. Hickey did not dispute that investor funds had been used to pay selling and administrative expenses. Instead, the evidence shows that Mr. Hickey was permitted to use the funds in this manner. As an initial matter, the evidence at trial established that, consistent with the representations made in the PPM, 100% of investor monies from Fund I went to the Fund I borrower, CCP-I, and 100% of Fund II monies went to the Fund II borrower, JMR. (Tr. 10/17/05, 1926, 1930-32, 1938; Tr. 10/18/05 2165-66.) The government contends that this was a fiction because the borrower then transferred funds to the general partner in contravention of the spirit and letter of the PPM. However, Lynn, Dillender, the Continental Capital auditor, testified that he found support for such transactions in the documents. For example, Mr. Dillender was not troubled by the fact that investor funds were being used to pay broker commissions and general and administrative expenses of the general partner because he found support for these expenditures in the Partnership Agreement, which was part of the PPM. Specifically, the Partnership Agreement authorized CCP-I to use investor funds to make payments under the

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

20.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   financing agreement. (Dillender Direct)  Furthermore, Mr. Dillender testified that the documents

2   authorized syndication payments, which he described as the initial cost incurred to get the

3   partnership set up.   (Tr. 10/17/05 1798-99.)   Certainly this is contrary to the government's

4   assertions.

5          Mr. Dillender also found adequate support for each of the entries in the financial records

6   of Continental Capital which Mr. Baly, the government's forensic accounting expert, testified

7   about during his examination (Tr. 10/14/05 1797-98, 1800-01, 1810-20.)  In fact, contrary to the

8   government's unsupported conjecture that agreements such as the management fee contract (Ex.

9   182), the financing fee agreement (Ex. 186), the asset management fee agreement (Ex. 187), and

10  the Service Agreements (Exs. 183, 184, 185) evidenced fraudulent conduct, it was these very

11  agreements that legitimized the intercompany transactions which Baly identified.   Indeed, the

12  evidence showed that the general partner, for instance, CCSG in the case of Fund I, was

13  authorized to act on behalf of the limited partnership, including entering into contracts on its

14  behalf.   (Tr. 10/17/05 1895-96, Ex. 34, p. A18)  In addition to reviewing these agreements,

15  Mr. Dillender reviewed the invoices and tracked the payments.  (Tr. 10/17/05 1934-35, 1937.)

16  Mr. Dillender testified that he never found any irregularity about the intercompany relationships

17  or the invoicing with regard to the entities he audited in 1992. (Tr. 10/17/05 1937.)

18         The government also attempted to prove at trial that Mr. Hickey misappropriate funds for

19  his own personal gain.  The evidence established merely that, of the $18 million that investors

20  contributed to Funds I and II, Mr. Hickey's net draw was $1.4 million, which was paid to him

21  over a three year period between July 1991 and August 1994, and that the entirety of these

22  distributions were reflected in the books of Continental Capital. (Tr. 10/18/05 2170-71.)

23  Mr. Dillender pointed out that any net income of an S corporation flows through to the

24  shareholders where they declare it as income and put it on their personal tax returns, and then the

25  accumulated earnings of the company become available as contributions to shareholders. Just as

26  they are responsible as stockholders for the taxes, they are also entitled to the distribution of the

27  profit. (Tr. 10/17/05 1919-20.) Moreover, the books reflect deposits from Mr. Hickey's personal

28  bank account to various Continental Capital through the same time period.  (Tr. 10/18/05 2166.)

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                    21.                    DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL ET AL.
CR 97-0218 WHA

1     As for Mr. Baly, he testified that he reviewed all of Mr. Dillender's audits in connection

2   with his cash analysis of the Continental Capital entities and found no reason to question those

3   audits. (Tr. 10/18/05 2163)  Indeed, Mr. Baly made no determination and expressed no opinion

4   as to whether any of the expenses made by an Continental Capital entity he identified were within

5   reasonable bounds.  Rather, Mr. Baly simply added the categories of expense that were already

6   pre-defined in the books of Continental Capital. (Tr. 10/18/05 2184)  Nor did Mr. Baly express

7   any opinion as to the propriety of the amounts drawn by Mr. Hickey or Ms. Tang.

8     Significantly, Mr. Dillender, testified that if, during the course of an audit he found or

9   suspected fraud, he was obligated to follow through on those leads.  Dillender never found fraud

10   in the course of any of his audit between 1992 and 1994. (Tr. 10/17/05 1893.)  Moreover, nothing

11   about the affiliated relationship itself of these companies suggested fraud. (Tr. 10/17/05 1931.)

12              **b.     There is Insufficient Evidence to Establish That Mr. Hickey
                         Had the Requisite Criminal Intent.**

13

14              Even if the government had proved the existence of a fraudulent

15   scheme to sell securities or mail fraud, the government failed to carry its burden of proving that

16   Mr. Hickey had the intent to perpetrate fraud.  Indeed, a great deal of the evidence refuted the

17   notion of Mr. Hickey's criminal intent.  As one example, it was established that Mr. Hickey's

18   limited partnership interest in Fund I was $72,500.  (Tr. 10/3/05 221.)  Mr. Hickey's decision to

19   invest a significant amount of his own money in Fund I does not square with the notion that he

20   intended to defraud those investors.  The bottom line is that, at best, the evidence establishes that

21   Mr. Hickey ran into difficulties in carrying out efforts related to the projects underlying Fund I

22   and Fund II, which might give rise to a claim of negligence but do not rise to the level of a

23   criminal fraud.

24              *  *  *  *  *

25              Notwithstanding the jury's verdict, the government's case has failed on the most

26   fundamental levels.  The factual contentions on which the government's fraud case relied were

27   not actually supported by the evidence admitted at trial.  And the evidence that was actually

28   admitted at trial does not amount to proof of the crimes of securities or mail fraud—certainly not

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

22.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL*
CR 97-0218 WHA

1    with respect to Fund I because of the insurmountable statute of limitations problem.  Accordingly,

2    the verdict must be set aside and a judgment of acquittal entered for Mr. Hickey.

3        **B.**     **Even if the Court Chooses Not to Enter a Judgment of Acquittal, The Court
                     Should Set Aside The Jury's Verdict And Grant A New Trial.**
4

5            Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may grant a

6    new trial to [Mr. Hickey] if the interests of justice so require." Fed. R. Crim. P. 33.  The Court

7    may consider "*[a]ny* error, defect, irregularity or variance" which affects Mr. Hickey's substantial

8    rights. Fed. R. Crim. P. 52(a) (emphasis added).  There are nine grounds justifying a new trial,

9    which are discussed in turn in the following Sections 1-9.[3]

10       **1.**     **Mr. Hickey Is Entitled to a New Trial Because it is Clear, Based on the
                     Weight of the Evidence and Credibility of the Witnesses, That the Jury
11                   Reached a Seriously Erroneous Result in Returning a Guilty Verdict.**

12           A district court's power to order a new trial is greater than its power to

13   grant a motion for acquittal.  *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000)

14   (citing *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)).  The district court need not

15   view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so

16   doing evaluate for itself the credibility of the witnesses.  *Id.*  The trial court may order a new trial

17   based on the weight of the evidence when it is clear that the jury has reached a seriously

18   erroneous result.  *Id.*  This case is one in which the jury did reach the wrong result, and the Court

19   should therefore exercise its discretion in granting a new trial.

20       **a.**     **The Full Weight of the Evidence Favors a Finding That There
                     Was No Scheme to Defraud Fund I Investors on or After July
21                   16, 1992, as the Statute of Limitations Requires.**

22           As discussed in greater detail above, *see supra* Section III.A.1, the

23   government had the burden of proving beyond a reasonable doubt that Mr. Hickey committed

24   fraudulent conduct on or after July 16, 1992.  In the Indictment, the government alleged that

25   conduct relating to Count Twelve began on June 28, 1991 and continued until September 19,

26

27   ---
     [3] Even if the Court grants Mr. Hickey's motion for judgment of acquittal, "the [C]ourt shall also
     determine whether any motion for a new trial should be granted if the judgment of acquittal is
28   thereafter vacated or reversed, specifying the grounds for such determination." Fed. R. Crim. P.
     29(d).

1    1994. At trial, however, the government failed to offer any evidence regarding criminal conduct

2    related to Fund I that occurred after June 28, 1992. Because the government failed to present *any*

3    evidence of *any* conduct within the relevant limitations period related to Fund I, there is

4    insufficient evidence to sustain the conviction on Count Twelve. Even if the Rule 29 standard

5    were not met, there can be no doubt that Mr. Hickey at least deserves a new trial under Rule 33

6    when the weight of the evidence is considered.

7          A recent Ninth Circuit opinion, *United States v. Fuchs*, 218 F.3d 957 (9th Cir. 2000),

8    provides strong support. The facts of *Fuchs*, while similar to this case, were actually weaker for

9    the defendants than the facts presented here. In *Fuchs*, an indictment for conspiracy alleged ten

10   overt acts, but "the acts that most strongly support[ed] a finding of conspiracy fell outside the

11   statute of limitations." *Id.* at 963. The defendants brought a motion to dismiss the indictment,

12   which was denied, in part, because the indictment alleged that certain overt acts were committed

13   within the limitations period. At trial, the government presented only minimal evidence of any

14   overt act occurring within the limitations period. The trial court did not instruct the jury on the

15   statute of limitations. *See id.* at 961. The defendants were convicted, but the court of appeals

16   reversed, citing Supreme Court authority holding "that when a general verdict may be based on a

17   legally inadequate ground, such as because of a statutory time bar, the verdict should be set

18   aside." *Id.* at 962 (citing *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other*

19   *grounds, Burks v. United States*, 437 U.S. 1, 98 (1978)). The court of appeals explained that

20   because the jury could have based its general verdict on acts alleged in the indictment that

21   occurred outside the limitations period, which would be a legally inadequate ground, the district

22   court should have set aside the verdict. *See id.* at 962. The court of appeals also found that the

23   error affected the substantial rights of the defendants, noting that the government offered very

24   little evidence regarding any overt act that had been committed during the limitations period. *See*

25   *id.* at 963.

26         Here, the government presented *no* evidence at trial to prove *any* criminal conduct relating

27   to Fund I within the limitations period. That is, the *full-weight* of the evidence is that there was

28   no criminal conduct relating to Fund I on or after July 16, 1992. The verdict, therefore, even on

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO
978618 v1/SF
24.
DEF.'s MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   the mail fraud and securities fraud counts relating to Fund II was substantially, if not entirely,

2   based on a "legally inadequate ground," *see Fuchs*, 218 F.3d at 962, and it is clear that the jury

3   has reached a seriously erroneous result. *See Kellington*, 217 F.3d at 1095. Accordingly, a new

4   trial should be granted as to Count Twelve.

5                    **b.      The Evidence Strongly Weighs in Favor of a Finding That Mr.**
                              **Hickey At No Time Engaged In A Scheme to Defraud Fund I or**
6                              **Fund II Investors.**

7                    Above we have argued that the evidence admitted at trial is

8   insufficient, even aside from the statute of limitations issue relating to Count Twelve, to sustain a

9   conviction of Mr. Hickey for fraudulent acts under the securities fraud and mail fraud statutes as

10  to all counts. *See supra* Section III.A.2. We incorporate that argument here by reference as

11  support for this alternative motion for new trial. Even if the Court were to find that the Rule 29

12  insufficiency of the evidence standard is not met, the Court is empowered to grant a new trial

13  where, as here, the weight of the evidence so clearly demonstrates that the jury has reached a

14  seriously erroneous result. *See Kellington*, 217 F.3d at 1095.

15                   In considering this basis for a new trial, the Court may also consider the credibility of the

16  government's witnesses, including whether their recall of events which occurred more than ten

17  years ago, at times with unexplainable precision, is reliable. Indeed, much of the government's

18  case was based upon statements which Mr. Hickey purportedly made regarding his personal

19  finances, the security, and the use of the funds, which came in through the witnesses recalling

20  events and conversations after several preparation sessions with the government's attorneys. For

21  example, the Court might recall the testimony of Sean West, who testified that he studied the

22  package he received from Continental Capital in order to provide an independent fairness opinion

23  on the Fund II loan at least eight years ago, yet he somehow was able to testify in great detail

24  about whether he had ever seen specific provisions in the Master Loan Agreement shown to him

25  by the government's lawyers during his direct examination. (11/7/05 2347-48.)

26                   Likewise, Mr. Jones testified that he "got most of [his] information from John Hickey"

27  which in turn, presumably formed the basis of his testimony. (Tr. 10/6/05 585.) However,

28  further cross examination highlighted the unreliability of Mr. Jones' testimony:

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                    25.                    DEF.'S MPA ISO MOTION FOR
                                                       JUDGMENT OF ACQUITTAL *ET AL*.
                                                       CR 97-0218 WHA

1    Q: These conversations that you are telling us about that you had with John Hickey these

2    are all occurring in the period of 1992 to 1994, right?

3    A: Correct.

4    Q: The most recent one would be some 11 years ago?

5    A: Correct.

6    Q: Do you have any notes of any of these conversations?

7    A: No, I don't.

8    ***

9    Q: Did you review any of your records from mid-1994 back to 1992 in an attempt to

10   reconstruct any of the conversation you had with John Hickey or Mamie Tang?

11   A: No.

12   (Tr. 10/6/05 586-87.) Indeed, Mr. Jones testified on direct that his father considered the Vacaville

13   property an important part of his investment, later essentially recanting that testimony during

14   cross examination and admitting that he knew all along that the Vacaville property was no longer

15   part of the fund and that he never bothered to inform his father because Sonoma provided

16   sufficient security. (*See supra*, Section III.A.2(a)(2) at 14.)

17        Likewise, Mr. Gimmy's credibility was fraught with problems.   (*See supra*, Section

18   III.A.2(a)(2) at 18, hereby incorporated by reference.)  His testimony regarding the "falsity" of

19   the $8.7 million appraisal cannot be believed.

20        **2.    Mr. Hickey Is Entitled to a New Trial Because the Court Erred in
            Permitting Evidence of Events Leading to the 1992 Settlement
21            Agreement with Wells Fargo.**

22        Prior to trial, Mr. Hickey filed a motion in limine seeking to exclude

23   evidence of the events which led to the 1992 settlement agreement with Wells Fargo, which the

24   Court denied, except that the government would not be permitted to raised fraud allegations from

25   that suit. This ruling was error because the only relevance of the Wells Fargo litigation was the

26   alleged impact of the stipulated judgment for approximately $6.5 million on the net worth of the

27   defendant and Ms. Tang as it related to the personal guarantee.  No other fact related to that

28   litigation, including the underlying dispute, Wells Fargo's claims, or even the terms of the

1  settlement agreement unrelated to the liability itself, such as Wells Fargo's right to audit the

2  Continental Capital entities, bore any relevance whatsoever to the charges in the Indictment.

3  Nevertheless, the government saw fit to spend an entire day of testimony on all of the

4  excruciating details of that lawsuit in a clear attempt to cloud the issues and persuade the jury that

5  Mr. Hickey was "guilty" in the Wells Fargo litigation, when that was neither proven nor true.

6       Mr. Hickey's fears underlying his Wells Fargo motion in limine materialized with the

7  very first government witness, Janice Harwell.  Despite the fact that none of Wells Fargo's fraud

8  allegations was ever found to be true, nor was any liability of any kind admitted in the settlement

9  agreement, other than the amount of the stipulated judgment, (CITE, Ex. 1, ¶ 19.) the government

10  nonetheless elicited pejorative testimony from Ms. Harwell which created the impression that Mr.

11  Hickey was a thief.  For example, in the context of describing the relief that Wells Fargo sought

12  by way of a probate petition, *relief which the Court never ordered*, Ms. Harwell stated that:

13         a constructive trust is a way of – is essentially a court order that
           freezes an – makes available to a party like Wells Fargo assets
14         which have been acquired through the use of money that didn't
           belong to the person whose assets you are trying to impose a trust
15         on.  So in a case where money has been diverted from the rightful
           owner and used to buy cars, houses, businesses, real estate, this
16         constructive trust remedy allows you to seize the assets into which
           the money has been transformed.
17

18  (Tr. 10/3/05 118:3-11.)   Further, in describing the sequence of actions that were filed,

19  Ms. Harwell testified that the discovery process which included a deposition of Mr. Hickey led to

20  "additional evidence that led us to believe that the C.J. Wood trust had been a victim of a

21  diversion of funds .... [a]nd we had more idea who the people were we felt were responsible."

22  (Tr. 10/3/05 122:2-6.)  Even Ms. Harwell's characterization of the settlement agreement was

23  inflammatory.  According to Ms. Harwell, Wells Fargo "got the right to tear [Mr. Hickey and

24  Ms. Tang's] lives apart looking for assets that might be used to satisfy the judgments" thereby

25  implying that Mr. Hickey was lying about his net worth. (Tr. 10/3/05 157:21-23.)

26       This testimony undoubtedly had the effect of tainting the jury by conjuring an image of

27  someone who was untrustworthy.  As a result, Mr. Hickey is entitled to a new trial.

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

27.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1                **3.**       **Mr. Hickey Is Entitled to a New Trial Because the Court Erred in**
                                 **Excluding Any Evidence of Relevant Events After September 1994.**

2

3                  On September 12, 2005, the Court granted in part and denied in part the

4 government's Motion in Limine to Exclude Improper Expert Testimony. In particular, the Court

5 ruled that Mr. Hickey's real estate financing expert, Stephen Roulac, would not be permitted to

6 testify as to the reasons that Fund I and Fund II failed as described in Chapters XI and XII of his

7 July 1, 2005, expert report. Those chapters indicated that but for the SEC action, real estate

8 development ventures pursued by John Hickey and Mamie Tang would have been successful and

9 the limited partners would have realized the investment outcome similar to that as represented in

10 the offering document. Furthermore, the description of the financial model created to simulate

11 the outcome of John Hickey's business plan substantiates that the investors would have realized

12 the outcomes represented in the Fund I and Fund II PPMs, but for the SEC action. This was error

13 because such testimony was critical to Mr. Hickey's defense to show that, in fact, the investments

14 were viable and the projects were moving forward in accordance with the statements made in the

15 PPMs. Instead, the jury heard a one-sided story which obviously left them with the impression

16 that Mr. Hickey ran the funds to the ground through what must have been fraud and deceit., when

17 in fact, his efforts to keep the projects alive were formidable.

18             The Court's ruling on this motion in limine, however, did not stop at Mr. Roulac's

19 testimony regarding the SEC action. Throughout the trial, the Court expanded the scope of the

20 ruling, allowing only extremely limited testimony regarding *any* events that occurred after the

21 Court-appointed receiver took over the operations of Continental Capital. For instance, William

22 Hoilman, the head of the broker-dealer committee, was only permitted to testify as to the

23 problems he encountered at Continental Capital, and not as to his own efforts to garner support

24 from investors to raise more money in order to keep the projects alive or his beliefs regarding the

25 projects' viability following his investigation in 1994. (Tr. 10/19/05 2314-16.) Likewise, Steven

26 Anderson, the receiver who took over the operations of Continental Capital in September 1994,

27 was precluding from testifying about the effect that the imposition of the receivership had on the

28 business and Mr. Hickey's efforts to protect Fund I and Fund II's assets through bankruptcy. (Tr.

1    11/8/05 2608.)  This gap in the testimony constituted error for the same reasons as above insofar

2    as Mr. Hickey was precluded from presenting critical evidence to show the viability of the

3    projects as they were described in the PPM.  Had Mr. Hickey been permitted to complete the

4    projects to fruition, the investors would have derived a profit in the manner described in the

5    PPMs.  Instead, the SEC's investigation and subsequent action and resulting imposition of a

6    receivership effectively shut down the operations of Continental Capital, and as a result, the

7    projects were never completed.  Evidence of the "aftermath" of the SEC investigation would

8    likely have led the jury to a different conclusion regarding Mr. Hickey's guilt.

9          Indeed, what little evidence was permitted on this point was consisted with the notion that

10   the projects were viable and on track.  Tony Jones testified that by the middle of 1994, close in

11   time when Continental Capital was essentially shut down by the imposition of the receiver, the

12   Sonoma and Napa projects were still viable. (Tr. 10/5/05 587.)  In fact, despite the investor

13   checks that bounced in July 1994, Mr. Jones believed that the entitlements were on track in

14   Sonoma and Napa, and that Continental Capital was being properly managed. (Tr. 10/5/05 661.)

15   Likewise, project manager David Dolter believed that as of July 1994, the full entitlement process

16   for Napa Oaks I remained very feasible and would be completed by January or February 1995.

17   (Tr. 11/8/05 2571-72.)

18          **4.    Mr. Hickey Is Entitled to a New Trial Because the Court Erred in Not
                    Giving a Statute of Limitations Instruction.**
19

20                 As discussed in greater detail above, *see supra* Section III.A.1, the

21   government had the burden of proving beyond a reasonable doubt that Mr. Hickey committed

22   criminal conduct on or after July 16, 1992.  Because the government failed to do this—in fact,

23   failed to present *any* evidence supporting this burden—Mr. Hickey contends that the verdict as to

24   Count Twelve should be set aside and a judgment of acquittal entered.  Mr. Hickey also makes a

25   new trial argument in the alternative based on the weight of the evidence.  *See supra* Section

26   III.B.1.a.  The statute of limitations problem in this case presents yet a third independent ground

27   for setting aside a guilty verdict as to Count Twelve: the Court's error of not giving a statute of

28   limitations instruction in contravention of established federal authority.

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

29.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1    "[A] statute of limitations instruction is clearly required under established Supreme Court

2    law ...." *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000). Although defense counsel

3    did not object to the lack of such an instruction at sidebar after the Court charged the jury,

4    Mr. Hickey has not waived or forfeited this error, and therefore a new trial is warranted in order

5    to protect Mr. Hickey's substantial rights. *See United States v. Olano*, 507 U.S. 725, 732-34

6    (1993) (holding that "[d]eviation from a legal rule is 'error' under Rule 52 unless the rule has

7    been waived," and explaining that waiver, as opposed to forfeiture, "is the 'intentional

8    relinquishment or abandonment of a known right'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464

9    (1938))).

10   The Ninth Circuit's decision in *Fuchs* provides direct support for a new trial on this

11   ground. In *Fuchs*, the indictment for conspiracy alleged ten overt acts, but "the acts that most

12   strongly support[ed] a finding of conspiracy fell outside the statute of limitations." 218 F.3d at

13   963. The defendants brought a motion to dismiss the indictment, which was denied, in part,

14   because the indictment alleged that certain overt acts were committed within the limitations

15   period. At trial, the government presented only minimal evidence of any overt act occurring

16   within the limitations period. The trial court did not instruct the jury on the statute of limitations,

17   *see id.* at 961, and the defendants were subsequently convicted. The defendants did not object to

18   the absence of a jury instruction based on the statute of limitations, nor did they raise the issue in

19   their post-trial motions. *See id.* Although the defendants in *Fuchs* failed to properly object to the

20   absence of a statute of limitations instruction, the court of appeals exercised review. *See id.* at

21   961-62. The Court found that the failure to present a statute of limitations instruction to the jury

22   constituted plain error.[4]

23   In reversing the defendants' convictions, the court of appeals cited Supreme Court

24   authority holding "that when a general verdict may be based on a legally inadequate ground, such

25   ---
     [4] While the court of appeals in *Fuchs* applied the plain error standard under Rule 52(b) because
26   the issue was raised for the first time on appeal, the district court here is to apply the more lenient
     general standard under Rule 52(a). *See United States v. Doherty*, 675 F. Supp. 726, 733 & n.9 (D.
27   Mass. 1987), *aff'd in part & rev'd in part on other grounds*, 867 F.2d 47 (1st Cir. 1989); *see also*
     *Olano*, 507 U.S. at 734 (more lenient standard under Rule 52(a) places burden on the government
28   to prove no error, whereas, under Rule 52(b), this burden of persuasion is shifted to the
     defendant).

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                          30.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   as because of a statutory time bar, the verdict should be set aside." *Id.* at 962 (citing *Yates v.*
2   *United States*, 354 U.S. 298, 313 (1957), *overruled on other grounds, Burks v. United States*, 437
3   U.S. 1 (1978)). The court of appeals explained that because the jury could have based its general
4   verdict on acts alleged in the indictment that occurred outside the limitations period, which would
5   be a legally inadequate ground, the district court should have set aside the verdict. *See id.* at 962.
6   The Court also found that the error affected the substantial rights of the defendants, noting that
7   the government offered very little evidence regarding any overt act that had been committed
8   during the limitations period. *See id.* at 963; *cf. United States v. Jake*, 281 F.3d 123 (3d Cir.
9   2002) (finding no plain error where the defendant himself admitted that an overt act was
10  committed within the limitations period); *United States v. Matzkin*, 14 F.3d 1014, 1018 (4th Cir.
11  1994) (finding that the District Court did not commit plain error when it failed to include an
12  instruction based on the statute of limitations where "there was ample evidence to prove a number
13  of overt acts within the statutory period").

14        As in *Fuchs*, the jury here was not properly instructed on the law, which requires the
15  government to prove beyond a reasonable doubt conduct in furtherance of the scheme to defraud
16  Fund I investors in the limitations period. Moreover, whereas in *Fuchs* there apparently was
17  *some* evidence of conduct within the limitations period, in Mr. Hickey's case there was *no* such
18  evidence.   The Court should grant a new trial to correct this error, protect Mr. Hickey's
19  substantial rights, and ensure "the fairness, integrity, [and] public reputation of [these] judicial
20  proceedings." *See United States v. Tavakkoly*, 238 F.3d 1062, 1066 (9th Cir. 2001) (court may
21  exercise review of verdict to determine whether the failure to instruct the jury "engendered 'error
22  seriously affect[ing] the fairness, integrity, or public reputation of judicial proceedings'" (quoting
23  *Fuchs*, 218 F.3d at 962 (9th Cir. 2000))); *see also Olano*, 507 U.S. at 736 (articulating this
24  standard as the proper guide to exercise of remedial discretion under Rule 52(b)).

25        **5.      Mr. Hickey Is Entitled to a New Trial Because Counts Twelve And**
26              **Thirteen Should Have Been Dismissed.**

27        In a pretrial motion to dismiss Counts Twelve and Thirteen of the
28  Indictment, Mr. Hickey argued that those counts were brought well beyond the applicable five

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                            31.                  DEF.'S MPA ISO MOTION FOR
                                                            JUDGMENT OF ACQUITTAL *ET AL.*
                                                            CR 97-0218 WHA

1    year limitations period and therefore were barred.   Each of those counts broadened or

2    substantially amended the charges in the superseded indictment; therefore, the statute of

3    limitations would not have been tolled as to those counts.  Furthermore, as argued in the motion

4    papers, the government's delay in bringing Counts Twelve and Thirteen prejudiced Mr. Hickey

5    and was a violation of his due process rights because Mr. Hickey was forced to prepare to defend

6    each of those counts in a short amount of time, particularly where the deadline for submitting

7    expert reports was imminent.  The Court erroneously denied Mr. Hickey's motion on June 23,

8    2005.  Allowing evidence and argument at trial related to Counts Twelve and Thirteen affected

9    Mr. Hickey's substantial rights.  Therefore, he should be granted a new trial.

10            **6.      Mr. Hickey Is Entitled to a New Trial Because Count Eight Should
                        Have Been Dismissed Prior to the Commencement of Trial.**

11

12                  Prior to the commencement of the trial, Mr. Hickey brought a motion to

13   dismiss Count Eight on statute of limitations grounds, which the Court erroneously denied.  As a

14   result, the government presented evidence related to this count, which included the testimony of

15   Beverly Heft and a number of mailings.  The parade of investor witnesses that the government

16   presented surely impacted the jury's view of the purported harm caused to investors.  Because of

17   the cumulative nature of this evidence and the Court's error in allowing Count Eight to remain in

18   the case, it is in the interests of justice for Mr. Hickey to receive a new trial.

19            **7.      Mr. Hickey Is Entitled to a New Trial Because The Case Should Not
                        Have Proceeded During the Pendency of the Interlocutory Appeal.**

20

21                  In late 2004, the Court directed the government and Mr. Hickey to address

22   the issue of whether the Court was divested of jurisdiction over this case while Mr. Hickey's

23   appeal from an earlier motion to dismiss was pending before the Ninth Circuit Court of Appeals.

24   The Court's concern over whether it had jurisdiction apparently was triggered by the Ninth

25   Circuit's recall of the mandate on October 18, 2004, in order to permit Mr. Hickey to file a

26   petition for rehearing and suggestion for rehearing en banc.  Mr. Hickey requested a stay of the

27   pretrial proceedings, arguing that such proceedings at the district court level impinged upon his

28   right not to be tried.  The Court denied Mr. Hickey's request, and proceeded with the trial in spite

1    of the fact that there was a pending interlocutory appeal.  On September 26, 2005, the jury was

2    impaneled and sworn, and the trial commenced.  When the jury was impaneled and sworn, Mr.

3    Hickey's interlocutory appeal remained pending.  In fact, it was not until on or about October 3,

4    2005, that the U. S. Supreme Court denied Mr. Hickey's Petition for a Writ of Certiorari.

5    Because the trial commenced during the pendency of the interlocutory appeal, and the Court was

6    without authority to commence the trial, Mr. Hickey's entire trial was invalid, and he is entitled to

7    a new trial.

8            **8.      Mr. Hickey Is Entitled to a New Trial Because the Indictment Should
              Have Been Dismissed for Violation of the Speedy Trial Act.**
9

10           For the reasons stated in Mr. Hickey's motion to dismiss filed

11   September 23, 2005, the Indictment should have been dismissed for violation of the Speedy Trial

12   Act, 18 U.S.C. § 3161 *et. seq.*  Mr. Hickey's substantial rights are affected by the Court's denial

13   of that motion on November 7, 2005.  Accordingly, he should receive a new trial.

14           **9.      Mr. Hickey Is Entitled to a New Trial Because the Indictment Should
              Have Been Dismissed.**
15

16           For the additional reasons stated in Mr. Hickey's motion to dismiss filed

17   September 23, 2005 – including dismissal of Counts Twelve and Thirteen of the Indictment for

18   violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et. seq.* and for post-indictment delay,

19   dismissal of the Indictment as violative of the statute of limitations, dismissal of the mail fraud

20   counts in the Indictment as insufficient, dismissal of the Indictment because the government

21   apparently provided false information to the grand jury, and a demand for production of the full

22   grand jury transcripts for all the indictments in this case – the Indictment should have been

23   dismissed.  Mr. Hickey's substantial rights are affected by the Court's denial of that motion on

24   November 7, 2005.  Accordingly, he should receive a new trial.

25   **IV.     CONCLUSION**

26           The evidence admitted at trial is insufficient to sustain Mr. Hickey's conviction for mail

27   fraud and securities fraud.  Mr. Hickey's conviction as to Count Twelve is barred by the statute of

28   limitations because the government failed to prove criminal conduct pertaining to Fund I on or

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF                                    33.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   after July 16, 1992.  Moreover, the evidence did not prove the existence of the alleged scheme to

2   defraud Fund I or Fund II investors' nor did it establish that Mr. Hickey had the requisite criminal

3   intent.  Therefore, the Court should set aside the jury's verdict and enter a judgment of acquittal

4   in favor of Mr. Hickey.

5      Alternatively, there are nine compelling reasons to grant Mr. Hickey a new trial in the

6   interests of justice.  First, the weight of the evidence makes it clear that the jury reached a

7   seriously erroneous result.  Second, the Court erred in permitting evidence of Mr. Hickey's

8   purported bad character pertaining to the Wells Fargo Bank litigation.  Third, the Court erred in

9   excluding any evidence of relevant events after September 1994.  Fourth, the Court erred in not

10  giving a statute of limitations instruction.  Fifth, Counts Twelve And Thirteen should have been

11  dismissed prior to the commencement of trial.  Sixth, Count Eight should have been dismissed

12  prior to the commencement of trial.  Seventh, the case should not have proceeded during the

13  pendency of the interlocutory appeal.  Eighth, the Indictment should have been dismissed for

14  violation of the Speedy Trial Act.  Ninth, the Indictment should have been dismissed.  For all the

15  foregoing reasons, the Court should grant Mr. Hickey's motion for new trial.

16  Dated: January 9, 2006       COOLEY GODWARD LLP

17

18            *Joseph P. Russoniello*

19            Joseph P. Russoniello

20            Attorneys for Defendant
            JOHN A. HICKEY

21

22

23

24

25

26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978618 v1/SF

34.

DEF.'S MPA ISO MOTION FOR
JUDGMENT OF ACQUITTAL *ET AL.*
CR 97-0218 WHA

1   COOLEY GODWARD LLP
    JOSEPH P. RUSSONIELLO (44332) jrussoniello@cooley.com
2   JOHANNA CALABRIA (226222) jcalabria@cooley.com
    101 California Street, 5th Floor
3   San Francisco, CA 94111-5800
    Telephone:   (415) 693-2000
4   Facsimile:   (415) 693-2222

5   Attorneys for Defendant
    JOHN A. HICKEY

6

7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                          SAN FRANCISCO DIVISION

11

| | |
|---|---|
| 12   UNITED STATES of AMERICA, | Case No.  CR 97-0218 WHA |
| 13               Plaintiff, | **ADDENDUM TO DEFENDANT JOHN A. HICKEY'S MOTION FOR JUDGMENT OF ACQUITTAL AND, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL** |
| 14        v. | |
| 15   JOHN A. HICKEY, | Date:      February 28, 2006 |
| 16               Defendant. | Time:      2:30 p.m. |
| 17 | Dept.:     9, 19th Floor |
| | Judge:    Hon. William H. Alsup |

18

19          Defendant John A. Hickey respectfully submits this addendum to his Motion for

20   Judgment of Acquittal and, in the Alternative, Motion for New Trial. In addition to the nine

21   independent grounds for a new trial listed in Section III.B, pursuant to Rule 33 of the Federal

22   Rules of Criminal Procedure, Mr. Hickey hereby submits a tenth ground, namely, that the Court

23   erred in excluding certain testimony of Denis Rice, the defendant's expert on Rule 506 private

24   placements.

25          On September 16, 2005, the Court ruled on the parties' pretrial motions in limine.

26   Regarding the testimony of Mr. Rice, the Court ruled in part that testimony regarding the

27   adequacy of disclosures in the PPM and materiality would be addressed on a question-by-

28   question basis. The Court further ruled that Mr. Rice would not be permitted to testify to what

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978744 v1/SF                                1.                    DEF.'S ADDENDUM TO MOTION FOR
                                                                 JUDGMENT OF ACQUITTAL *ET AL.*
                                                                 CR 97-0218 WHA

1  Pillsbury Madison & Sutro or others would have done or what Stanford did or did not have an

2  interest in as described in ¶ 4.1.12 of his August 4, 2005 Amended Report, nor would he be

3  permitted to testify as to the subject matter set forth in ¶ 4.1.8 of his August 4, 2005 Amended

4  Report (regarding the Vacaville property). (September 16, 2005, Order Regarding Pretrial

5  Motions, at 2:20-3:2.)

6          At trial, the Court precluded Mr. Rice's testimony at critical times.  For example, the

7  Court did not permit Mr. Rice to testify as to whether he reached a conclusion that the Sonoma,

8  Vacaville, or Calaveras properties had been secured in order to comply with the PPM. (Tr.

9  11/9/05 2812-16.)  Further, the Court sustained the government's objection to the following

10  question: "The tie-in between the guarantee and the viability of the guarantee and the underlying

11  venture, was there an adequate disclosure of that tie-in, in your opinion?" (Tr. 11/9/05 2828.)

12  These rulings fundamentally prevented Mr. Hickey from presenting an important aspect of his

13  defense, namely, that the steps Mr. Hickey took with respect to the projects underlying Fund I and

14  Fund II were consistent with the disclosures contained in the PPM.  Mr. Rice's expert testimony

15  on this point was critical because of the technical nature and length of the PPMs.  Therefore, the

16  Court erred in precluding Mr. Rice's testimony in this manner.

17          For all the foregoing reasons, as well as the reasons set forth in Defendant John A.

18  Hickey's Memorandum Of Points And Authorities In Support Of His Motion For Judgment Of

19  Acquittal And, In The Alternative, Motion For New Trial, Court should grant Mr. Hickey's

20  motion for new trial.

21

    Dated: January 10, 2006                    COOLEY GODWARD LLP
22

23

24                                             Joseph P. Russoniello

25                                             Attorneys for Defendant
                                               JOHN A. HICKEY
26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978744 v1/SF                              2.

DEF.'S ADDENDUM TO MOTION FOR
JUDGMENT OF ACQUITTAL ET AL.
CR 97-0218 WHA

1                               **PROOF OF SERVICE**

2        I am a citizen of the United States and a resident of the State of California.  I am

3 employed in San Francisco County, State of California, in the office of a member of the bar of

4 this Court, at whose direction the service was made.  I am over the age of eighteen years, and

5 not a party to the within action.  My business address is Cooley Godward LLP, 101 California

6 Street, 5th Floor, San Francisco, California  94111.  On the date set forth below I served the

7 documents described below in the manner described below:

8              •    **ADDENDUM TO DEFENDANT JOHN A. HICKEY'S MOTION FOR JUDGMENT OF**

9                 **ACQUITTAL AND, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

10    ☒      (BY MESSENGER SERVICE) by consigning the document(s) to an authorized

11            courier and/or process server for hand delivery on this date.

12 on the following party in this action:

13 AUSA Timothy P. Crudo
   AUSA Christopher J. Steskal
14 Office of the US Attorney
   Northern District of California
15 450 Golden Gate Ave, 11th Floor
   San Francisco, CA 94102
16

17      Executed on January 10, 2006 at San Francisco, California.

18

19                                          _Wendy Asbel_
                                           Wendy Asbel

20

21

22

23

24

25

26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978744 v1/SF                2.              DEF.'S ADDENDUM TO MOTION FOR
                                                JUDGMENT OF ACQUITTAL *ET AL.*
                                                  CR 97-0218 WHA

1  **PROOF OF PERSONAL SERVICE**

2  I hereby declare:

3  I am employed in the City of San Francisco, County of San Francisco, California; I am

4  over the age of eighteen years and not a party to the within cause; my business address is First

5  Legal Support Service, 1138 Howard Street, San Francisco, California 94103.  On January 10,

6  2006, I served the within:

7

     •    **ADDENDUM TO DEFENDANT JOHN A. HICKEY'S MOTION FOR JUDGMENT OF**
8         **ACQUITTAL AND, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

9  on the interested parties in this action by personally hand delivering a copy of said document(s)

10  to the address listed below:

11  AUSA Christopher J. Steskal
    AUSA Timothy P. Crudo
12  Office of the US Attorney
    Northern District of California
13  450 Golden Gate Ave, 11th Floor
    San Francisco, CA 94102

14

15  I declare under penalty of perjury under the laws of the State of California that the

16  foregoing is true and correct, and that this declaration was executed on January 10, 2006.

17  SIGNATURE: _Nathaniel Brooks_

18  PRINT NAME: _Nathaniel Brooks_
19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO

978744 v1/SF

2.

DEF.'S ADDENDUM TO MOTION FOR
JUDGMENT OF ACQUITTAL ET AL.
CR 97-0218 WHA

1   COOLEY GODWARD LLP
    JOSEPH P. RUSSONIELLO (44332)  jrussoniello@cooley.com
2   JOHANNA CALABRIA (226222)  jcalabria@cooley.com
    101 California Street, 5th Floor
3   San Francisco, CA  94111-5800
    Telephone:   (415) 693-2000
4   Facsimile:    (415) 693-2222

5   Attorneys for Defendant
    JOHN A. HICKEY

6

7

8                 UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12   UNITED STATES of AMERICA,              Case No.  CR 97-0218 WHA

13                  Plaintiff,              [PROPOSED] ORDER GRANTING
                                            DEFENDANT JOHN A. HICKEY'S MOTION
14           v.                             FOR JUDGMENT OF ACQUITTAL AND, IN
                                            THE ALTERNATIVE, MOTION FOR NEW
15   JOHN A. HICKEY,                        TRIAL

16                  Defendant.              Date:    February 28, 2006
                                            Time:    2:30 p.m.
17                                          Dept.:   9, 19th Floor
                                            Judge:   Hon. William H. Alsup
18

19

20          Upon application of counsel on behalf of Defendant John A. Hickey and good cause

21   appearing, Defendant's Motion for Judgment of Acquittal and, in the Alternative, Motion for

22   New Trial is hereby granted.

23          **IT IS SO ORDERED.**

24

25   DATED: January _____, 2006

26                                          _____
                                            THE HONORABLE WILLIAM H. ALSUP
                                            United States District Judge
27

28

COOLEY GODWARD LLP
ATTORNEYS AT LAW
SAN FRANCISCO
        978689 v1/SF                    1.         [PROPOSED] ORDER GRANTING DEF.'S MOTION
                                                   FOR JUDGMENT OF ACQUITTAL ET AL.
                                                   CR 97-0218 WHA